**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 14-cv-2092-WJM-KLM

THE CLAUDIA NELSON FAMILY TRUST, by Elizabeth A. Spanel, trustee,

    Plaintiff,

v.

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,

    Defendant.

---

## ORDER AFFIRMING DEFENDANT'S DENIAL OF BENEFITS

---

This case arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq*. ("ERISA").  Plaintiff, the Claudia Nelson Family Trust ("Trust"), claims that Defendant Hartford Life and Accident Insurance Company ("Hartford") violated ERISA when it issued its final determination letter denying supplemental life insurance benefits to Claudia Nelson ("Nelson"), who died on January 8, 2013.  (ECF No. 1.)

For the reasons set forth below, Hartford's denial of benefits is affirmed and the Trust's claim for disability benefits is denied.

## I.  FACTS & PROCEDURAL HISTORY

**A.  The Plan and the Policy**

Nelson was a copy editor for her employer, Swift Communications ("Swift").

(ECF No. 29 at 7, ¶ 1.)[1]  Nelson was therefore a participant in Swift's group employee benefits plan ("Plan").  (*Id*. at 8, ¶ 2.)

Effective January 1, 2013, Hartford funded the Plan through Group Policy No. GL-872957 ("Policy").  "The Policy [was] incorporated into, and form[ed] a part of, the Plan."  (Administrative Record ("R.") (ECF Nos. 21-1 to 21-4 and 37-1 to 37-2) at 35.) ERISA governs both the Plan and the Policy.  (*Id.* at 26, 35.)  The Plan designates Hartford as the claims fiduciary for benefits provided under the Policy.  (*Id.* at 35.)  The Plan grants Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy."  (*Id.*)

## B.    The Supplemental Life Insurance Policy

Sometime in 2012, Nelson developed cancer.  (*Id*. at 194.)  Her "actual date last physically at work" was September 7, 2012.  (*Id*. at 198.)  In November 2012, however, Nelson took advantage of Swift's open enrollment period for 2013 to enroll for a supplemental life insurance benefit of $50,000.  (*Id*. at 189.)  On January 8, 2013, Nelson succumbed to her cancer.  (*Id*. at 194.)

## C.    The Trust's Claim

By letter dated May 28, 2013, Nelson's husband (apparently acting on the Trust's behalf) made a claim on Hartford both for basic life insurance benefits in which Nelson had been enrolled for many years, as well as for the supplemental benefits in which she had just enrolled.  (*Id*. at 186.)  Hartford began to investigate the claim, and in particular communicated several questions to Swift, including an e-mail asking Swift to clarify

---

[1] All page citations for ECF documents are to the page number specified in the ECF header, which does not always match the document's internal pagination.

whether Nelson's supplemental life insurance was a continuation of a previous year's benefits or whether Nelson instead had enrolled for the first time in the previous year's open enrollment period.  (*Id*. at 184.)  Swift replied, confirming that Nelson had enrolled for the first time in the previous year's open enrollment period, for a policy effective January 1, 2013.  (*Id*. at 179.)  Swift further clarified that Nelson "was off work, but on a paid medical leave (vacation, sick, MML [Swift's major medical leave program]) through December 2012."  (*Id*. at 174.)

Swift also filled out and sent to Hartford a Hartford-issued "proof of death form." (*Id*. at 198.)  One line in that form states, "Provide employee's actual date last physically at work," to which Swift responded, "09/07/2012."  (*Id*.)  The next line of the form states, "Provide a reason employee did not return to work on their next scheduled workday," and provides checkboxes for four responses: "Illness," "FMLA (provide approval form)," "Retirement," and "Other (please explain)."  (*Id*.)  Swift checked "FMLA (provide approval form)," but apparently did not attach any approval form.  (*Id*.)

Through other parts of the form, Swift informed Hartford of Nelson's earnings, stating that "[e]ffective . . . 01/09/2013" (*i.e.*, the day after Nelson's death) her "[r]egular hours scheduled to work" were "40."  (*Id*.)[2]  Swift also reported that Nelson's insurance was "discontinued" as of "01/31/2013."  (*Id*.)

## D.    Hartford's Denial of Supplemental Life Insurance Benefits

By letter dated July 16, 2013, Hartford informed the Trust that it had approved Nelson's basic life insurance benefits but denied Nelson's supplemental life insurance

---

[2] The Trust interprets this to mean that Swift was paying Nelson her regular wages through January 9, 2013.  (ECF No. 30 at 3.)

benefits ("Denial Letter").  (*Id*. at 71–75.)  Noting that Nelson's supplemental life benefit was scheduled to become effective January 1, 2013, at the earliest, Hartford pointed to the following portion of the Policy regarding circumstances in which that effective date could be deferred:

> **Deferred Effective Date:** *When will my effective date for coverage or a change in my coverage be deferred?*
>
> If, on the date You are to become covered:
>
> 1) under The Policy;
> 2) for increased benefits; or
> 3) for a new benefit;
>
> You are not Actively at Work such coverage will not start until the date You are Actively at Work.

(*Id*. at 72 (quoting *id.* at 11) (formatting in original).)  Hartford's Denial Letter then quoted the definition of "Actively at Work":

> **Actively at Work** means at work with Your Employer on a day that is one of Your Employer's scheduled workdays.  On that day, You must be performing for wage or profit all of the regular duties of Your job:
>
> 1) in the usual way; and
> 2) for Your usual number of hours.
>
> We will also consider You to be Actively [a]t Work on any regularly scheduled vacation day or holiday, only if You were Actively [a]t Work on the preceding scheduled work day.

(*Id*. at 73 (quoting *id.* at 27) (formatting in original).)

The Denial Letter then provided the following explanation:

> We based our decision to deny your claim for benefits on Policy Language and all documents contained in Ms. Nelson's claim file, viewed as a whole, including the following specific information:

4

> 1.      State of Colorado death certificate for Claudia Jane Nelson[.]
> 2.      Proof of Death Claim form completed by a representative of Swift Communications[.]
> 3.      Supplemental Life Insurance Enrollment form dated January 1, 2013.
> 4.      E-mail verification of coverage from a representative of Swift Communications.
>
> The State of Colorado death certificate for Claudia Nelson's [*sic*] indicates her date of death was January 8, 2013.
>
> The Proof of Death Claim form completed by a representative of Swift Communications indicates that Ms. Nelson's date last physically worked was September 7, 2012 due to FMLA.
>
> * * *
>
> The documentation on file indicates that Ms. Nelson elected Supplemental Life Insurance for an effective date of January 1, 2013.  Based on the information reviewed, Ms. Nelson's last day actively at work was September 7, 2012 due to FMLA and there is no indication that she returned to work prior to her death on January 8, 2013 . . . .  Accordingly, since Ms. Nelson was not Actively at Work on the date the Supplemental Life was to become effective, on January 1, 2013, and she did not return to work as an Active Employee at any time after this date, the Supplemental Group Life Insurance benefits are not payable.

(*Id.* at 73–74.)

The Denial Letter went on to inform the Trust of its right to appeal: "If you do not agree with the reason why your claim was denied, in whole or part, and you wish to appeal our decision, you must write to us within sixty (60) days of the date of this letter."

(*Id.* at 74.)

## E.     The Appeal

According to the Denial Letter's 60-day appeal deadline, the Trust had until

September 14, 2013 to submit its appeal.  It did not do so by that date.  Rather,

Hartford and the Trust communicated several times about information needed to pay

the basic life insurance benefits.  (*Id*. at 58–59, 69, 70.)  On October 3, 2013, Nelson's

husband called Hartford regarding this issue and also stated the Trust's intent to

dispute Hartford's denial of supplemental benefits.  (*Id*. at 59.)  On December 23, 2013,

the Trust sent written materials to Hartford regarding the basic life insurance benefits

and also stated, "we will be filing an appeal" of the supplemental life denial.  (*Id*. at 92.)

The Trust "requested that you [Hartford] provide a complete copy of the policies for

Claudia's Standard and Supplemental Life Policies for review."  (*Id*.)

Finally, on January 27, 2014, the Trust, through its attorney, submitted a written

appeal.  (*Id*. at 78–79.)  The Trust argued as follows:

> Swift Communications is subject to the Family Medical
> Leave Act ("FLMA" [*sic*]).  The FMLA entitles covered
> employees to up to 12 weeks of leave each year for their
> own serious illness.  Hartford's Policy extends coverages for
> 12 weeks of FMLA leave.[3]  Claudia's last date physically at
> work was September 7th 2012.  Ms. Nelson was on
> approved leave the next working day after September 7th
> 2012.  Claudia was required by Swift's Extended Medical
> Leave Program to first exhaust her vacation time, personal
> leave time, and sick leave before beginning FMLA leave.
>
> Claudia was absent from work after September 7th 2012
> due to a physical condition.. [*sic*]  She was on regularly
> scheduled vacation leave beginning September 10th, which
> was her next regularly scheduled work day.  She then
> exhausted her sick leave and personal leave before
> beginning FMLA leave.  She was within the twelve week
> period of FMLA leave at the time of her death. . . .

---

[3] This assertion does not accurately summarize the Policy's application to this case, as
discussed in Part III.D, *infra*.

6

> Claudia was considered to be Actively at Work for purposes
> of coverages, including supplemental Group Life Insurance,
> from September 10th 2012 until her death on January 8,
> 2013 pursuant to the terms of the Policy since she was on
> regularly scheduled leave, sick leave, personal leave, and
> then FMLA leave.

(*Id*.)  The Trust also repeated a request for "a copy of the complete Hartford Policy

issued to Swift."  (*Id*. at 79.)

By letter dated February 10, 2014, Hartford responded that the appeal was

"submitted beyond the specified 60-day appeal period and, because of the late appeal

submission, cannot be considered."  (*Id*. at 66.)  In argument to this Court, the Trust

claims that it finally received a complete copy of the Policy from Hartford eight days

later.  (ECF No. 28 ¶ 4.)

## II.  LEGAL STANDARD

ERISA governs employee benefit plans, including disability benefit plans.

29 U.S.C. §§ 1101 *et seq*.  "When an individual covered by the plan makes a claim for

benefits, the administrator gathers evidence, including the evidentiary submissions of

the claimant, and determines under the plan's terms whether or not to grant benefits.  If

the administrator denies the claim, the claimant may bring suit to recover the benefits

due to him under the terms of his plan."  *Jewell v. Life Ins. Co. of N. Am.*, 508 F.3d

1303, 1308 (10th Cir. 2007) (internal quotation marks omitted; alterations incorporated).

Federal courts have exclusive jurisdiction over such suits, as ERISA preempts most

relevant state laws.  29 U.S.C. § 1144(a).

The Supreme Court has held that "a denial of benefits challenged under [the civil

enforcement provision of ERISA, 29 U.S.C.] § 1132(a)(1)(B)[,] is to be reviewed under a

7

de novo standard unless"—as is the case here (*see* R. at 35)—"the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). In such a situation, the Court determines whether the denial of benefits was arbitrary and capricious. *Id*.[4]

Under the arbitrary and capricious standard, the administrator's decision need not be the only logical one or the best one; the decision will be upheld provided that it is "grounded on any reasonable basis." *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999). "The reviewing court need only assure that the administrator's decision falls somewhere on a continuum of reasonableness—even if on the low end." *Nance v. Sun Life Assurance Co. of Can.*, 294 F.3d 1263, 1269 (10th Cir. 2002).

Here, Hartford both evaluates and pays any claim for benefits. (R. at 35.) It therefore has an inherent conflict of interest between its own desire to turn a profit and its fiduciary duty to fairly evaluate all claims. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008). The effect of that conflict of interest, if any, is one factor that this Court must consider when evaluating whether Hartford's denial was arbitrary and capricious. *Id.* at 117.

## III.  ANALYSIS

## A.   Supplemental Record Materials

Magistrate Judge Kristen L. Mix granted the Trust's motion to supplement the

---

[4] As discussed in greater detail below at Part III.A, Magistrate Judge Kristen L. Mix entered an order in this matter describing circumstances in which this appeal could be subject to *de novo* review. (ECF No. 33 at 6.) The Trust concedes, however, that the arbitrary and capricious standard applies. (ECF No. 31 at 1–2.)

administrative record.  (ECF No. 33.)  The Trust thereby obtained permission to
introduce (1) Nelson's payroll records, (2) a document describing "Swift's 'Extended
Medical Leave Program,'" and (3) "evidence of Ms. Nelson being on an approved leave
of absence."  (ECF No. 25 ¶ 6; *see also* R. at 203–13.)  The purpose of these
documents is to "prove that Ms. Nelson was Actively [a]t Work on September 7, 2012
and from September 8, 2012 was on regularly scheduled vacation, sick leave, and
major medical leave, after which she was on FMLA."  (ECF No. 25 ¶ 6.)  The Trust
asserts that establishing the foregoing also establishes its right to Nelson's
supplemental life insurance benefits under the language of the Policy.  (*Id*.)

Although the Magistrate Judge allowed these materials into the record, it is highly
uncertain whether this Court may consider them when reviewing Hartford's denial.  If
this Court was conducting a *de novo* review, there are limited circumstances in which it
may admit additional material into the record "when necessary to enable the court to
understand and evaluate the decision under review."  *Jewell*, 508 F.3d at 1309; *see
also Hall v. UNUM Life Ins. Co. of Am.*, 300 F.3d 1197, 1203 (10th Cir. 2002) ("The
party seeking to supplement the record bears the burden of establishing why the district
court should exercise its discretion to admit particular evidence by showing how that
evidence is necessary to the district court's de novo review.").  But the Trust concedes
that the Court's review in this case is under the arbitrary and capricious standard.  (ECF
No. 34 at 1–2.)  Under that standard, Tenth Circuit "case law prohibits courts from
considering materials outside the administrative record where the extra-record materials
sought to be introduced relate to a claimant's eligibility for benefits."  *Murphy v. Deloitte*

*& Touche Grp. Ins. Plan*, 619 F.3d 1151, 1162 (10th Cir. 2010).[5]

Here, the Trust's supplemental record materials "relate to [Nelson's] eligibility for benefits." (*See* R. at 203–13.) Indeed, the Trust wants those materials considered specifically to demonstrate that Nelson satisfied the terms of the Actively at Work requirement. (ECF No. 25 ¶ 6.) Under the *Murphy* decision, that would appear to be an impermissible purpose. But the Court cannot be entirely confident with that conclusion because the supplemental materials are no longer extra-record. The Magistrate Judge admitted them into the record (ECF No. 33), and Hartford waived any challenge to that decision when it failed to timely object. Fed. R. Civ. P. 72(a) ("A party may serve and file objections to the order within 14 days after being served with a copy. A party may not assign as error a defect in the order not timely objected to.").

In addition, the Trust has also asserted other purposes for the supplemental record material. In particular, the Trust claims that those materials show "procedural irregularities," referring to its position that Hartford treated the Trust unfairly with respect to the appeal. (*See, e.g.*, ECF No. 34 at 3–4.) The Trust argues that these alleged procedural irregularities show a conflict of interest, which the Court is obligated to consider when determining whether Hartford's decision was arbitrary and capricious. *See Glenn*, 554 U.S. at 112, 117.

---

[5] *Murphy* specifically dealt with requests for discovery as part of the district court review process, *see id.* at 1154, but discussed the question in the context of "extra-record supplementation" generally, *id.* at 1159. As to the Tenth Circuit's holding that district courts may not consider "materials outside the administrative record where the extra-record materials sought to be introduced relate to a claimant's eligibility for benefits," *id.* at 1162, this Court sees no reasoned distinction between pre-existing extra-record materials and those sought to be developed through discovery.

The Trust's invocation of procedural irregularities, however, is misdirected. Procedural irregularities are a reason for a court to apply *de novo* review even when the applicable plan would normally receive arbitrary and capricious review. *See LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796–800 (10th Cir. 2010). That is not an issue here. The Trust has repeatedly stated that arbitrary and capricious is the appropriate review standard. (ECF No. 30 at 8–9; ECF No. 32 at 3; ECF No. 34 at 1–2.)

Nonetheless, the Trust's invocation of procedural irregularities in the appeals process could be construed as a reference, however inartful, to the idea that a plan administrator such as Hartford "may be found to have abused its discretion where it refuses to consider materials submitted for its review by the plan participant." *Murphy*, 619 F.3d at 1159 n.3.[6] Such refusal would seem to be independent evidence of potential arbitrariness or capriciousness, as well as evidence of a conflict of interest (at least in the general sense that refusal to consider relevant materials is consistent with a desire to avoid fully and fairly evaluating a claim, which is in turn consistent with an inference that the plan administrator is putting its own interests ahead of the participant's interests).

Given the ambiguity in this situation, the Court has evaluated its conclusions below in light of the record as originally filed and the record as supplemented by the Trust. The Court finds that it would reach the same conclusions either way.

_____

[6] "Abuse of discretion" and "arbitrary and capricious" are "interchangeable" in the context of ERISA review. *Weber v. GE Grp. Life Assur. Co.*, 541 F.3d 1002, 1011 n.10 (10th Cir. 2008) (internal quotation marks omitted).

11

Accordingly, the Court will treat the supplemental record materials as part of the record.[7]

**B.      "Regularly Scheduled Vacation Day or Holiday"**

The Trust argues that Nelson was "Actively at Work" at the time of her death because Swift supposedly classified Nelson as an active employee until her death. (ECF No. 30 at 10; ECF No. 32 at 6; ECF No. 34 at 10.)  Although an employer's classification is potentially relevant evidence, *see Weber*, 541 F.3d at 1014, Swift's classification of Nelson makes no difference under the circumstances because it has no connection to the Policy's definition of "Actively at Work."

The Policy provides two ways that a plan participant can satisfy the Actively at Work requirement.  First, the participant can perform all of his or her regular job duties "in the usual way" and for that participant's "usual number of hours."  (R. at 27.)  The Trust does not claim that Nelson satisfied this requirement.

Second, a participant will be considered Actively at Work if he or she meets the foregoing requirements on the "scheduled work day" before a "regularly scheduled vacation day or holiday."  (*Id*.)  The Trust interprets this to mean that "[t]he Policy

---

[7] In support of its "procedural irregularities" argument, the Trust repeatedly asserts that, in phone conversations after the Denial Letter, Hartford repeatedly told Trust representatives that it (Hartford) would accept any appeal from the Denial Letter, including new documentation submitted with that appeal, even if submitted after the 60-day appeal deadline had expired. (ECF No. 30 at 7–8; ECF No. 32 at 2, 6–7.)  In support, however, the Trust cites only Hartford's telephone call log for October 22 and October 31, 2013.  The October 22 entry reads: "recd call from Mr. Spanel [Nelson's husband].  He apologized for delay, he is still working on [*sic*] with his attorney.  He has had difficulty with everything that has happened."  (R. at 59.)  The October 31 entry reads: "adjusted diary based on prior call."  (*Id*.)  The Court finds that these two cryptic call log entries are insufficient to support the claim that Hartford agreed to consider an untimely appeal.  Nonetheless, even if the Court assumed for the sake of argument that the Trust's claim had support in the record, it would not alter the Court's conclusions below.

deem[ed] Ms. Nelson to be 'Actively at Work' while on vacation *and other leave*." (ECF

No. 32 at 5 (emphasis added).)  However, this Court is required to give the words of the

Policy "their common and ordinary meaning, as a reasonable person in the position of

the plan participant (not the actual participant) would have understood them." *Pirkheim*

*v. First Unum Life Ins.*, 229 F.3d 1008, 1010 n.2 (10th Cir. 2000).  While the Policy

certainly deemed Nelson to be Actively at Work while on "vacation," the Trust has

offered no argument on how an individual in the position of the plan participant could

reasonably assume that "vacation" implicitly extended to "other leave," and to medical

leave in particular.  Failure to offer any such argument could be deemed a waiver.  *See*

D.C.COLO.LCivR 7.1(d) ("a motion involving a contested issue of law shall . . . be

supported by a recitation of legal authority incorporated into the motion").  In any event,

the Court does not believe that a reasonable participant could derive this meaning.

        To begin, the entire relevant phrase is "regularly scheduled vacation day or

holiday."  This phrase unambiguously points to "vacation" in the typical sense of "a

period of time that a person spends away from home, school, or business usually in

order to relax or travel."  *See* Merriam-Webster Online, s.v. "vacation,"

http://www.merriam-webster.com/dictionary/vacation.  The modifier "regularly

scheduled" also undermines any assumption that "vacation" extends to "other leave,"

given that such other leave (*e.g.*, sick days) usually is not regularly scheduled.  Finally,

the Policy already refers to various types of what one might call "other leave," including

"a documented leave of absence," "Family and Medical Leave," and "Military Leave of

Absence."  (R. at 12.)  None of these other types of leave is mentioned in connection

with "regularly scheduled vacation day or holiday." *See Pirkheim*, 229 F.3d at 1010 n.2

("[i]n interpreting the terms of an ERISA plan we examine the plan documents as a

whole" (internal quotation marks omitted; alteration in original)).  Accordingly, "regularly

scheduled vacation day" does not encompass "other leave," at least in the sense of

medical leave.  Or, at a minimum, Hartford did not exercise its discretion arbitrarily or

capriciously by interpreting "regularly scheduled vacation day" to exclude individuals on

medical leave.  *Winchester v. Prudential Life Ins. Co. of Am.*, 975 F.2d 1479, 1486

(10th Cir. 1992) ("deference must be accorded to the plan administrator in its

interpretation of the plan").

Under that interpretation and the circumstances of this case, the Trust was

required to establish an unbroken chain of "regularly scheduled vacation day[s] or

holiday[s]" (*i.e.*, non-medical leave days) from September 7, 2012, until January 1,

2013.  The Trust did not meet that requirement and therefore did not establish that

Nelson had been Actively at Work on any day in which her supplemental life benefits

could have become effective.

## C.    "Due to FMLA"

The Trust nonetheless argues that the following sentence from the Denial Letter

demonstrates an error: "Ms. Nelson's last day actively at work was September 7, 2012

due to FMLA and there is no indication that she returned to work prior to her death on

January 8, 2013."  (R. at 74.)  The Trust specifically takes issue with "due to FMLA."

The Trust argues that, in reality, Nelson was at work on September 7, 2012 and then

began her time off, first through vacation days, then through sick days, then through

Swift's major medical leave policy.  (ECF No. 30 at 3.)  But "[s]he was not on FMLA [leave as of September 7, 2012]."  (*Id.*)

The relevance of this argument is unclear.  The Trust appears to be saying that Hartford was mistaken if it denied Nelson's benefits under the assumption that she began FMLA leave on September 7, 2012.  The Trust also argues that Hartford had a duty to investigate further—*i.e.*, although the Proof of Death form specified "FMLA" as Nelson's status after her last day physically at work, (a) that same form required Swift to attach a written FMLA authorization, but no such authorization was attached, and (b) e-mail correspondence from Swift to Hartford stated that Nelson actually progressed through vacation hours, sick hours, and major medical leave hours.  (ECF No. 30 at 11; ECF No. 32 at 4–6; ECF No. 34 at 2–3.)  Had Hartford seriously considered that evidence, the Trust argues that Hartford would have requested information such as the payroll records that are now part of the administrative record due to the Magistrate Judge's ruling, and Hartford would have somehow concluded that Nelson had been Actively at Work.  (*See id.*)

In certain circumstances, an ERISA fiduciary has a duty to go beyond the materials actually submitted and investigate on its own.  *See Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 808 (10th Cir. 2004).  But even if Nelson was on vacation (rather than FMLA leave) for the first few weeks following September 7, 2012, and even if Hartford had requested information such as the payroll records that have now been added to the administrative record, the outcome would not have changed.  The Trust's contributions to the administrative record show that Nelson had exhausted her vacation hours by the end of October.  (R. at 206.)  She then began using Swift's "major medical

15

leave" hours, but appears to have exhausted those in November.  (*Id.*)  Finally, the

Trust's attorneys admit that she moved from major medical leave to FMLA leave, and

remained on FMLA leave until her death.  (*Id*. at 79.)  Thus, no later than January 1,

2013 (the first date on which Nelson's supplemental life insurance could have

potentially become effective), Nelson was on FMLA leave and never returned to work

before her death.  FMLA leave is not within the Policy's definition of Actively at Work.

(*See* Part III.B, *supra*.)[8]

## D.     Continuation of Coverage

The Trust also appears to argue that, under the Policy, approved FMLA leave

entitles plan participants to have their life insurance coverage "continued for up to 12

weeks."  (ECF No. 30 at 5 (quoting R. at 13).)  But that portion of the Policy has no

effect in this case because Nelson's supplemental life insurance coverage never

became effective, and therefore could not be "continued."  Accordingly, the Policy's

provision for FMLA leave is irrelevant under the circumstances.

## E.     Conflict of Interest

Finally, this Court must consider what effect, if any, Hartford's conflict of interest

---

[8] The record contains a bit of conflict regarding precisely when Nelson began FMLA leave.  In e-mail communications between Swift and Hartford, a Swift representative stated that Nelson had been on paid leave through December 2012.  (R. at 174.)  However, Swift's payroll records show that Nelson was paid in October 2012 based on vacation and major medical leave hours, and was paid in November 2012 based on her remaining major medical leave hours, but was paid nothing in December 2012.  (R. at 206.)  This suggests unpaid FMLA leave beginning in December 2012.  Regardless, even if the record is viewed in the light most favorable to the Trust, Nelson was on major medical leave through December 31, 2012, and then on FMLA leave from January 1, 2013, until her death.  Because FMLA leave is not within the Policy's definition of Actively at Work, Nelson was never Actively at Work on any day before her death in which she could have become eligible for the supplemental life insurance.

had on its decision. *Glenn*, 554 U.S. at 117. Having reviewed the administrative record and the arguments of the parties, the Court finds that Hartford's conflict of interest had no bearing on the outcome of the Trust's claim for benefits. The language of the Policy is clear and Hartford applied it according to its terms. Consequently, Hartford's conflict of interest does not provide a basis to find that Hartford acted arbitrarily or capriciously.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. The Trust's claim for supplemental life insurance benefits is DENIED;

2. The Clerk shall enter final judgment in favor of Hartford; and

3. The parties shall bear their own costs.

Dated this 8th day of July, 2015.

BY THE COURT:

William J. Martinez
United States District Judge